If you wouldn't mind stating the names for the record and the party you're representing. Steven Gentry from the Office of the State Appellate Defender representing Mr. Kevin Dawson this morning. And Assistant State's Attorney Marcy Jacobs representing the people of the state of Illinois. Okay. Fifteen minutes apiece and then time for rebuttal. Yes? A couple minutes? That should be more than enough. All right. Okay. Proceed? Thank you, Your Honor. Once again, my name is Steven Gentry from the Office of the State Appellate Defender representing Mr. Kevin Dawson this morning. This court should reverse Kevin Dawson's residential burglary conviction and remand for a new trial because his conviction was tainted by the jury's improper consideration of two erroneously admitted ESO statements regarding the element of unauthorized entry in a case which lacked direct evidence of this element. The statements in question were attributed to... I heard you say that, but if somebody opens a window and goes through an outside window, isn't that the same element that you're talking about, unlawful entry, going from outside a window to inside a window on a second level? The witness who testified that Mr. Dawson was trying to get in the second floor window testified that he saw an individual who he did identify as Mr. Dawson trying to enter the second floor window, but he also very clearly testified that he did not see him actually enter, merely he see how he made it to the second floor. And Mr. Dawson was not a stranger in this case. He was actually a longtime family friend of the people who lived on the second floor. He himself lived and stayed frequently on the first floor with his uncle, Earl Dawson, who also testified. This HUSA that you're referring to, isn't it just part of the course of conduct that the officers conducted in their investigation? Was it a part and parcel of what they needed to look at, whether or not they had the right individual? The HUSA testimony that we're talking about, that Mr. Dawson allegedly climbed up the side of the building using the gun, cannot be justified as course of conduct. No, but my question was, wasn't it part of the police officer's conduct? Isn't that why the trial court allowed it, because it was part of the- That is correct, Your Honor, that that is what the trial court justified its admission of the evidence on. But it cannot be justified for these purposes, because course of conduct investigatory testimony, as has been set forth in the case I cited in the briefs, involves an officer testifying, I had a conversation with a witness, and then I took the following steps. It does not involve revealing the substance of that statement. It certainly does not involve allowing the substance of that statement to come in when it's putting new evidence that was not before the jury on the crucial issue to be decided in the case. Here, the element of unauthorized entry. As I said before, Mr. Dawson was not a stranger. His uncle testified that he was a frequent visitor, both in his apartment and in the upstairs residence. And this testimony was corroborated by the one of the two- the only of the two residents of the upstairs unit who testified, Terry Halliday, who confirmed that Mr. Dawson was a long-time friendly friend. Now, while she did testify that she did not authorize his entry on that day, she also testified that her then-boyfriend, Mr. Stringer, frequently did have guests when she was not around. And the other witness, Elroy Dawson, testified that on that very day, he heard Kevin Dawson and Scott Stringer, the other individual who lived on the second floor, visiting with each other and going up to the second floor. So the question of whether or not Mr. Dawson's entry into that unit was authorized or not was really the weak point in the state's case. And it would seem that that is what they seemed to compensate for by- Or have fingerprints on the window. There were fingerprints on the window. And as I said before, Mr. Dawson was a frequent visitor there. Outside. Outside. He may well have been outside on that day. But the question is- Outside the second floor window? I mean, is there a balcony out there to walk on, or are we just talking about there's a window you open up to go into somebody's bedroom from the second floor? I- That's what I want to understand. How, if I'm invited to your house, inside your house, how my fingerprints get on the outside of the window? Your Honor, it is true that Mr. Dawson did not put on testimony explaining that. It is also true that the state did not put on testimony from Mr. Sternick, who was- There was uncontradicted testimony that he and Mr. Dawson were hanging out together in that apartment on that day. So while it is true that those fingerprints were not explained, certainly there may have been explanations. I can't think of a reasonable explanation for somebody's fingerprints being on the outside window of somebody's house on the second floor. Give me a reasonable explanation. The window was broken. The window was broken, Your Honor. And there was testimony to that fact. It was broken before the date of this incident. What part of the window was broken? I don't know that Ms. Howley specified that, but she did testify that it was broken. Was it the lock on the window that was broken? It might well have been. Okay. But I would know if there was a wrench outside the window, there was testimony. Certainly Mr. Dawson's fingerprints were not found on that. His fingerprints were not found on the dresser. It's not clear, as I said- What were the antecedents of the action that was discovered on him? There was a piece of clothing discovered on Mr. Dawson's person that Ms. Howley- It did not belong to him, correct? That Ms. Howley did testify looked like an item of clothing that she was not missing. That is correct, Your Honor. And that, however, does go to not necessarily the element of unauthorized entry. If, in fact, he had stolen that item of clothing, it could very well have been that he had done so as an invaded occupant. Likewise, he may have been involved in opening the window for any one of those reasons. People open their windows for reasons other than burglarizing homes of their acquaintances. The jury certainly must have been asking themselves why the state did not call to testify the male occupant, who was later the husband of the woman who testified, and may have been imitating any number of scenarios that would have explained Mr. Dawson's presence there. When it was deliberating, the jury sent out a note asking the court what was the testimony concerning how Mr. Dawson got to the second floor. This jury note shows very clearly that the jury was considering this evidence as it was determining the crucial question that they were charged to decide whether or not Mr. Dawson was guilty. Certainly, this went to the element of unauthorized entry. Well, if they're asking how the defendant climbed up to the window, does that necessarily borrow that they considered the statements as substantive evidence? Do they need to ask that question if they did? It would strain the ability to imagine that the jury was asking that question because they were curious about the investigative steps that the police were taking. Certainly, they were asking that because they were considering it for the truth of the matter asserted. And the fact that this was what they were focused on at the time that they were charged with determining guilt or innocence shows that this was not only improper hearsay, but it was also prejudicial. If I was to assume that the state went too far and it was an eliciting course of conduct testimony, is that your only evidence of prejudice, is the jury note? Well, that certainly demonstrates prejudice, but we have to look at the evidence as a whole here. And as I said, as I've been saying, the state's case for the element of unauthorized entry lacked direct evidence. The eyewitness saw Mr. Dawson trying to get into the window, but it did not seem to actually get in. It also, this witness also did not, for example, Mr. Dawson perhaps had initially climbed out of the window and then had tried to get back in. The evidence does not preclude that possibility. Mr. Sterling, the second floor resident, did not testify, and so therefore the jury was left alone and was looking at the other details surrounding this testimony and very clearly was considering testimony for purposes that was improper for it to do so. Excuse me. Go ahead. Who introduced the testimony regarding someone climbing up the gutter first? This was introduced by the state. I thought the defense did it. Didn't the defense in its cross-examination of Mr. Abassi ask him, didn't you tell the police that the guy climbed up the gutter? That was the first that it's introduced to testimony. Didn't he say, I don't know, maybe I did. It was five years ago. I don't remember. He said that he could not recall that. So the defense counsel had elicited from him that he could not recall that. I'm saying that the defense counsel brought in the testimony regarding somebody crawling up a gutter. The state had not done it. Absolutely not, Your Honor. Who had done it? What the defense counsel elicited was that the witness could not recall that. You didn't answer my question. The state had not introduced anything at that time about anybody climbing up a gutter. Am I correct? That is correct. That is correct. And then the defense asked the witness, if you told the police that someone climbed up a gutter. And so they introduced that issue, and then the witness said, I don't recall it. That doesn't mean they didn't do it. Right. That doesn't mean that there wasn't violence. But the gutter crawling came from the defense, not from the state. The defense is allowed to ask questions to demonstrate that there is no offense. To possibly lay a foundation for impeachment. That's what that is. Well, that defense counsel did not show. I mean, that's what the state certainly has asked this court to accept. But I would ask this court not to accept that because counsel did not seek to use this to impeach. Counsel may have tried to. What did he put it in for? What did he put it in for? If it was something that the state could not put in, why would he put that in? Why would he ask that question about improper evidence? To show how limited the state's actual evidence was. Okay. Thank you. All right. Thank you. If there are no other questions, I would ask on behalf of Mr. Dawson for the reasons stated this morning and in the briefs that this court reverses conviction, We're in for a new trial. We're in the act of murder for reducing sentence. Thank you. Thank you. Good morning again. Marcy Jacobs, Assistant State's Attorney for the People. Defendants claim that improper hearsay deprived them of a fair trial fails in three ways. I'll briefly tell you what they are, and then I'll go into each one in detail. It was not hearsay to begin with, first way. Second way, it was actively waived because by the time Sergeant Hartnett testified to this better situation, it was cumulative of testimony the jury had already heard. So just so we're clear, are we talking about the conversation of Mr. Abbasi to the first police officer then communicated on to the other officers? Yes. Okay. And then the third way is that the evidence in this case was absolutely overwhelming, and even if this was to be considered inadmissible hearsay, it would have been harmless. So this was not hearsay. It was properly admitted for a course of police conduct. And while it's true that the substance of the conversation was admitted in this case, the issues and the concerns that a court looks at when they're considering whether that's improper are two concerns that were not at issue here. The first one is that the declarant does not testify, which he did here, and the second one is that it goes to an essential element of the case. So this is like when a police officer gets called to the scene of a shooting and a crowd is on the corner and says, defendant did it, he went that way. And then the police officer testifies at trial, but no one from that crowd testifies. So here we have Mr. Abbasi testifying. He was cross-examined. He, to the best of his memory, said what he remembered about it, and by the way, he absolutely did testify. He testified that he saw defendant try to get in the window, but he also saw that defendant got in the window. He testified that while he was on the phone, defendant finally got in the window. That is the record, page 26, PPP 26. He also answered a question. You saw him go in. Is this the window you saw him go in through when there was a picture on exhibit? And that's PPP, these are 32, 35, 37, and he was also asked to ID defendant as the person climbing through the window. So there was testimony that he saw him go through the window, not just trying to open the window. There was testimony that he wasn't able to identify his face. He didn't get a look at his face. Yeah, so that's all true. So at any rate, the most important thing here, so we have Mr. Obese testifying, so that's not a concern when you have the substance of the conversation come in. But the most significant thing here is that this did not go to the very essence of the case. It did not go to an element of the crime. The answering is the element, and let me answer your question, Justice Lamkin. So there were pictures admitted at trial, and defendant did not put them into the record here. But what those would show, and this is based on the testimony, this was a first-floor, low-floor garage that there was a gutter, and he could step up and get, it was very low, like eight feet, and he could step up and get on the gutter. He then walked across this first-floor roof, and there was the window at his hand level. He wasn't climbing the gutter like Spider-Man onto the second roof trying to get in the window. He was standing in front of this second-floor window, standing on a flat first-floor roof, which is why it makes so much sense that his fingerprints landed there. So the fact that he got up to the first floor and then walked over to the window is not an essential element of the crime, and in fact, it doesn't even incriminate defendant particularly. It doesn't do any, it doesn't damage his defense. His defense. Well, it doesn't answer the defense that he was an invited guest. Well, so his defense is, he didn't, his defense was not that Mr. Obese did not see somebody climb up a gutter and open the window. His defense was it wasn't him. So this whole thing doesn't matter to his defense. It doesn't prejudice his defense. It doesn't matter what Mr. Obese said. If his entire defense is it wasn't me, it was someone else who did all these things. So, you know, he says he walked through the front door. Mr. Obese described in detail what he knew and what he saw, and that's why the statements at issue, Sergeant Hartnett said he saw, the witness said he saw a subject climb up the gutter, and Detective Dewey said he saw an individual. Nobody said it was a defendant, and that's when we're talking about letting in the substance of. So how is the course of conduct? Well, it describes why they went ahead and did what they did. It shows why the police went in and tried to get fingerprints off the gutter. Is that why? Well, certainly, that's. I was hoping that. Yes, absolutely. And the defense asked eight questions. When it came time to cross-examining the evidence technician, the state never brought the issue up again. The state has never brought the issue up, and the defendant cross-examined asking eight questions to the evidence technician about the gutter and the material on the gutter and could he get fingerprints off the gutter. So even so, as getting back to another point, yes, this was actively weighed by defendant. It was cumulative by the time they heard about it from Sergeant Hartnett. He, the defendant, talked about it in an opening argument. He said, this is what you're going to hear. When it didn't come out in direct exam and the state didn't even try to elicit it in direct exam, he went ahead and cross-examined on it. He continued to cross-examine on it. Three more witnesses he cross-examined on it. So it's because of. Do we know how many prints there were on the window? Well, there were three that were suitable for comparison. I think they lifted a couple more, but there were three that were listed. And where about on the window were they listed? That they didn't say. The testimony is strictly that they just were on the outside of the window, very clearly on the outside. So regardless, even if this were to be found inadmissible, which it should not be, this case had overwhelming evidence in it. I mean, we have a witness. That's how a defendant climbs through the window. And then a little while later, close by, he was caught with the proceeds. And he tried to evade police. He gave a false name. He fled. And, of course, then he has his three fingerprints on the outside of the window. And compared to ñ and, you know, this is an overwhelming case that we put on, that we did not leave Scott Stringer to testify. We certainly established this absolutely overwhelming case. He didn't ñ any issue with him was ñ we wouldn't even have known about it. It was injected by the defense in the defense council. By putting on the defense, I have no idea if we had access to him by the time of rebuttal, to rebut what they put on, but we wouldn't have known that. I have another question about Scott. Why did the estate's attorney make the statement about where is Scott? Yeah. Well, she certainly wasn't shifting the burden. And, first of all, and may I ñ please do not ñ you know, I implore this court not to ignore the fact that, right before she said the statement, she made a careful recitation of the burden of proof. And she stated, quote, the defendant is not required to prove his innocence. Quote, we unquestionably and unfailingly agree with and we unscrupulously honor this principle. And she was saying all this so that she could then contrast and say, but when a defendant does put on a case, then his witnesses are judged the same way as state witnesses. Instead, she talked about the ñ she pulled out the instruction of how you judge the believability of witnesses. She went through their defense witness. She went through all of the factors of why he wasn't believable. She talked about his demeanor. She talked about his bias and motive to lie. She talked about his memory issues, his inconsistent statement to the police. And summed it all up by talking about ñ and then ñ and on top of that, it was corroborated in contrast to the State's case that was significantly corroborated. And that is the entire context in which she made that comment. But ñ There was no explanation for the item of clothing on the defendant? There was no explanation. There was no explanation? Never heard about an explanation. I never read about one. So to continue, but in addition, it was invited by defense. And we ñ you know, when he injects the name of somebody in the trial, we have a right ñ it certainly makes sense that we would respond. And as you saw in my brief, we have a case that's almost literally identical, where there was a ñ a defendant was charged with burglary. He said he was an invitee. His attorney argued that ñ the name of the person who invited him in. And that court found unequivocally that the prosecutor's comment that the defendant did not call that person was proper. And as this Court should find, because ñ What's the name of the ñ That was People v. Sales. Oh. S-A-L-E-S? S-A-Y-L-E-S. Oh. 130, ill at third, and I have at 890. So just at that page, but ñ Thank you. And I know the defendant in his ñ in his reply brief mentioned that it's an older case. It is still absolutely good law. This Court has, over the years, has quoted it on other points, but it's still good law. It has not overturned it. It's almost identical. So did you have any more questions on that issue or the first issue? So I would just say, I just wanted to point out that there was overwhelming evidence in this case and defendants. First of all, his defense was completely based on speculation. I mean, the fact that there was weak circumstantial evidence that at some unknown point in time he may have been in that apartment. It certainly didn't say when ñ what point in time that was. And there's really no evidence that said when he was in the apartment, he got hot, he went in the back bedroom, the window got a little stuck, he had trouble getting up the stuck window. This is all speculation. No evidence. No testimony. And then went outside. And then, no, and then, no, because this is what the defense argued. He didn't know when he went outside. He argued while he was unsticking it from the inside, his fingerprints landed on the outside. So, of course, that's not all that plausible. And, you know, the evidence in this case was completely overwhelming. So with that, we would simply ask this court to affirm defendant's conviction if there are no more other questions. Thank you. Did the state shift the burden? The state absolutely shifted the burden when they asked where was Scott. They were feeling the heat of the obvious hold on their case and asked, should try to shift the burden to my client. My client's defense, which the state has misstated again this morning as they did at trial, was that there was reasonable doubt. While the evidence may have been expected to show some things, what happened at trial was that the state's evidence fell short on this issue. That's just responding to comments that the defense made during closing arguments. So where's the prejudice? Well, as to the shifting of the burden, well, shifting of the burden can never be invented later. And this case, I would also say, is vastly different from Sayers, which counsel was speaking of. In that case, that involved the state commenting on a witness that seemed to not exist. The defendant in that case had gone into a building. He had claimed he was an invitee of a person who he had named. No one was familiar with this person. The defendant disappeared prior to trial. Completely different situation than what we have here, where the state had certainly equal, if not greater, access to the witness, but it was shifting the burden by pointing out that Mr. Dawson had not called to trial. But Mr. Stringer here wasn't an alibi witness, right? And if he would have testified, all he would have done is cooperated with what the defendant would have said, right? That he was an invited guest. Presumably Mr. Stringer would have – well, there's no telling what Mr. Stringer would have testified to. We can only speculate. The testimony, however, in this case, there was nothing contradicting the testimony from Elroy Dawson that Kevin Dawson was an invited guest of Mr. Stringer on the very date of this offense. It's not an unknown date, as counsel suggested. Really? I'm sorry, because I didn't remember reading that. That he said he was in the apartment that day? Elroy Dawson testified that he heard Scott Stringer and Kevin Dawson socializing outside the apartment and that he heard them go up to that apartment on the day of this offense. Secondly, and I would also like to point out, the state is correct in the quoting of the record, but the state, I would point out, has not disputed, and the record will speak for itself, as to whether or not Mr. Adasi testified that he did not actually see Mr. Dawson entering through the window. He concluded that he entered through the window because when he called the police, when he turned away from the window to call the police and turned back, he was no longer there. So for these reasons that I've stated before and those in the briefs, Mr. Adasi will testify. All right. Thank you, counsel, for a well-argued matter. The court will take this under advisement.